**E-FILED**
Wednesday, 09 January, 2013 02:04:00 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CRAIG E. STONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-CV-3316 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Craig Stone appeals pro se from the denial of his application for Social Security Disability Insurance Benefits ("Disability Benefits") under Title II of the Social Security Act.  42 U.S.C. §§ 416(i), 423.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) .  Stone has filed a Motion for Summary Judgment (d/e 14), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e16).  The District Court referred this matter for a Report and Recommendation.  Text Order entered October 19, 2012.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be affirmed.

STATEMENT OF FACTS

Stone was born on August 20, 1962.  Stone earned an associate's degree in general business studies.  He suffers from severe back pain.  He is divorced.  In 2003, he underwent back surgery to relieve the pain.  The surgeons fused his L4, L5, and S1 vertebrae. The surgery did not relieve Stone's pain.  Since the surgery, Stone has suffered from chronic severe pain.  Answer to Complaint (d/e 12), attached Certified Copy of Transcript of Record of Proceedings (R.), at 461-62.

Stone worked as an accounting technician, a computer technician, an automobile salesman, and a teacher's aide.  His last employer, the Illinois Secretary of State's Office, placed him on medical leave several times between 2003 and 2008.  The Secretary of State's Office last placed him on medical leave on February 15, 2008.  He has not worked since.  R. 462, 811-12.

Stone filed his application on June 2, 2004.  He claimed that he became disabled on December 29, 2003.  His claim was initially denied because he was presumed able to perform substantial gainful activity because he continued working at the Secretary of State's Office.  R. 16-19. The initial decision became final on February 2, 2007.  R. 6.  This Court reversed and remanded the initial decision because the Commissioner did

not address whether Stone presented sufficient evidence to rebut the presumption.  Stone v. Commissioner, C. D. Ill. Case No. 07-3110, Opinion entered August 29, 2008 (2008 Opinion), at 20.  On remand, Stone amended his claim to assert that his disability began on February 15, 2008, when he went on his last disability leave.  R. 807-11.

Stone's medical records recount an extensive history of treatment for back pain.  See 2008 Opinion, at 2-5, for a discussion of Stone's medical history prior to the initial decision by the Commissioner.  The treatment has continued thereafter.

On July 3, 2007, Stone went to see his primary care physician Dr. Mark Savage, M.D.  Stone went to see Dr. Savage for his back pain. Stone reported the pain as constant.  Stone described the pain as stabbing and shooting.  Stone stated that the pain was located in his lower back and would radiate into his right leg.  Stone reported that his symptoms were aggravated by exertion, weight lifting, prolonged standing, prolonged sitting, and sneezing.  R. 603.

On examination, Dr. Savage found Stone had normal posture and normal gait; his strength was 5/5 or 4-/5 in his extremities; his reflexes were 2+ bilaterally; he had mild tenderness on palpation of his right and left flank and medial low back; he had no swelling; his back made some creaking

sounds; and his sensation was normal.  Dr. Savage diagnosed Stone with

a lumbar sprain.  Dr. Savage prescribed the following pain medications:

Oxycontin and a Duragesic Patch which administered a time-released dose

of 75 mg of Fentynal.  Dr. Savage prescribed one patch every three days.

R. 603-04.

On July 31, 2007, Dr. Savage completed a Medical Leave

Certification for Secretary of State's Office.  R. 608.  Dr. Savage stated

that Stone suffered from degenerative disc disease with severe pain.

Dr. Savage checked the boxes on the form to indicate that (1) Stone was

temporarily unable to perform the essential functions of his job due to his

back condition, but (2) Stone was not permanently and totally disabled

such that he will continue to be unable to perform any gainful employment.

R. 608-09.

On August 28, 2007, Stone again went to see Dr. Savage.  Stone

reported that he did not feel well, had decreased energy, and slept poorly.

Stone complained of side effects from the medication.  On examination,

Dr. Savage observed that Stone had a normal posture and gait, muscle

strength of 5/5 or 4-/5 in his extremities, and normal reflexes and sensation.

R. 614.  Stone had mild tenderness in his lumbosacral spine with no

swelling.  His range of lumbar motion was 30 degrees left and right side to

side, 90 degrees flexion, and 45 degrees left and right rotation.  Dr. Savage continued the prescriptions for Oxycontin and Duragesic Patches, and added Lunesta for Stone's sleeping difficulties.  R. 613-14.

On September 24, 2007, Stone again saw Dr. Savage.  Stone reported that he felt well with few complaints, his energy level was good when he used the patch, but he still had problems sleeping.  Dr. Savage's examination results were the same as the previous examination, except Dr. Savage noted fibrous bands and spasms in the surrounding tissue of his lower back.   Dr. Savage continued Stone's medications.  R. 615-16.

Stone saw Dr. Savage again on October 19, 2007.  Dr. Savage's examination results were the same as the previous exam.  Dr. Savage ordered a routine MRI of Stone's lumbar spine.  R. 620.  The MRI showed postoperative changes, but no evidence of neural compromise.  R. 622.

On November 16, 2007, Stone again saw Dr. Savage.  Stone again reported that he was feeling well and minor complaints, had good energy level when on the patch, but was still sleeping poorly.  Stone still reported side effects from the medication.  The results of Dr. Savage's examination were the same as the last visit except that Stone's gait was slow and cautious.  Dr. Savage again prescribed Oxycontin and Duragesic Patches,

but increased the dosage of Fentanyl in the patch from 75 mg to 100 mg.
R. 624-25.

On December 14, 2007, Stone again saw Dr. Savage.  At that time,
Stone again reported that he was feeling well with minor complaints, had
good energy on the patch, but was sleeping poorly.  Stone reported he was
using analgesics in addition to his prescription medications.  Dr. Savage's
examination results were the same as the last visit.  Dr. Savage continued
Stone's medications.  R. 626-27.

On January 2, 2008, Stone sent letter by facsimile transmission to
Dr. Savage.  R. 629-30.  Stone stated that he needed some documentation
for a summary judgment motion.  Stone asked Dr. Savage,

> *I am asking you if you could possibly write and fax me back
> today a note just stating that I am being forced to work and
> endure unreasonable pain and hardship and strong narcotic
> pain medication to endure this unneeded delay and I urgently
> need to be approved for disability, so that no further continuous
> damages from exertions of having to sustain working these
> hours and that I need the aid of benefits for my family and
> myself, so that I wont [sic] have to have further surgery and or
> more medications for which I am presently on in or to function
> as best as possible given the situation I am going through.

R. 630 (emphasis in the original).  The asterisk was handwritten.  Stone
handwrote in the top margin, "IF possible *      Attention Dr. Savage
(ASAP)".  R. 630.

In response, Dr. Savage wrote a letter addressed to "To whom it may concern," dated January 2, 2008.  Dr. Savage stated in the body of the letter,

> The above named patient [Stone] has endured incapacitating pain due to a previous injury and subsequent surgery.  He takes narcotics to continue to work through the pain.  Due to his severe injury he has applied for dissability [sic] but had been forced to continue to work to provide for his family and pay for his activities of daily living while going through several appeals.  He has gone above and beyond to comply with his regimen but is caught in the peril of financial ruin if he completely stops working while applying for dissability [sic] vs. taking narcotics to keep working while fighting his appeal.  This patient has been evaluated by several physicians who have recommended he be approved for dissability [sic].
>
> Despite pushing himself to work fulltime he has a lower quality of life due to constant pain while working with the only recourse to take high dose narcotics just to be able to arrive and endure his work duties.  He should be allowed to proceed with dissability [sic] so he can pursue other avenues of evaluation and treatment as well as reduce his narcotic demand that is needed when he has to work fulltime.

R. 739.

On January 11, 2008, Stone saw Dr. Savage again.  Stone again reported that he was feeling well with minor complaints, had good energy on the patch, but was sleeping poorly.  Dr. Savage's examination results were the same as the last visit.  Dr. Savage continued Stone's medications. R. 632-33.

On February 15, 2008, Stone saw Dr. Savage.  This was the date that Stone went on his last medical leave.  Stone reported to Dr. Savage that he had aggravated his back and the pain had increased.   Dr. Savage, however, also noted that Stone felt well with minor complaints, had good energy on the patch, and still had trouble sleeping.  Dr. Savage's examination results were the same as the last visit on December 14, 2007, except the reflexes in the right knee were worsening, from 2+ to 1+, and Stone's left and right flank and medial low back were "exquisitely" tender instead of mildly tender.  R. 637.   Dr. Savage continued Stone's medications.

On February 15, 2008, Dr. Savage also completed another Medical Leave Certification for the Illinois Secretary of State's Office.  Dr. Savage stated that Stone suffered from degeneration of the lumbar and lumbosacral intervertebral disc.  Dr. Savage checked the boxes to indicate that Stone was temporarily unable to perform the essential functions of his job, and also, permanently and totally disabled to the degree that he could not do any kind of work related to gainful employment.  R. 638. Dr. Savage, however, listed an estimated return to work date of August 15, 2008.  R. 638.

On March 5, 2008, Stone contacted Dr. Savage's office.  He reported that the left side of his back was bothering him.  Stone reported that the pain was "minor" in the "a.m.", but "terrible" in the "p.m."  R. 642. Dr. Savage prescribed Baclofen.  R. 642.

On March 12, 2008, Stone saw Dr. Savage.  Stone reported experiencing a lot of stress.  Dr. Savage's notes also state that Stone was feeling well with minor complaints, had good energy level when on the patch, and was still sleeping poorly.  Dr. Savage, however, also noted that Stone had an additional complaint of back pain.  The notes of the additional complaint stated that the course of the pain was increasing.  The pain was "stabbing, piercing, and shooting."  The pain was in the lumbar spine and was not radiating to other parts of the body.  The pain was "precipitated by heavy weight lifting."  The symptoms were aggravated by exertion, prolonged sitting, and lying down.  Dr. Savage's note stated that the pain "has been associated with leg weakness, and parethesias [sic] in leg, while there has been no chills, or fever."  R. 644.  Dr. Savage's examination results were the same as the February 15, 2008, results.  Dr. Savage continued the Duragesic and Oxycontin.  R. 644-45.

On April 14, 2008, Stone saw Dr. Savage.  The description of Stone's complaints, including the additional complaint of back pain, was the same as before.  Dr. Savage, however, noted for the first time that the emotional impact of his back problems was severe.  R. 648.  The results of Dr. Savage's examination were the same as the last visit.  Dr. Savage continued Stone's medications.  R. 648-49.

On May 6, 2008, Stone saw Dr. Stephen Weiss, M.D., for an independent medical examination.  Dr. Weiss is an orthopedic surgeon. Dr. Weiss examined Stone and reviewed Stone's medical records since the 2003 surgery.  Stone reported constant low back pain and intermittent episodes of pain running down both lower extremities, but primarily on the right radiating all the way to his foot.  Stone reported that the pain worsened on bending, lifting, twisting, prolonged sitting, and prolonged car rides.  R. 768-69.

On examination, Dr. Weiss observed that Stone had a normal gait, could walk on his toes, but would not attempt to walk on his heels. Dr. Weiss observed that Stone had moderate paravertebral muscle spasms.  Stone's range of motion was 80 degrees flexion and 30 degrees right and left bending.  Stone was afraid to extend his back.  Stone did not have any pain on superficial palpation.  Dr. Weiss found deep tendon

reflexes to be trace and symmetric at the ankles and knees, and he found no gross sensory deficit.  Stone's straight leg lifting was bilaterally pain free.  Dr. Weiss's diagnosis was status-post L5-S1 fusion.  Dr. Weiss was provided with a list of the essential functions of Stone's prior job with the Illinois Secretary of State's Office.  Dr. Weiss opined that Stone could perform all of the essential functions of the job except lift over 50 pounds. R. 767-71.

On May 9, 2008, Stone saw Dr. Savage.  Stone reported that he fell two weeks earlier while fishing and hurt his ribs.  Dr. Savage's notes stated that Stone was not feeling well, had decreased energy level, and was still sleeping poorly.  Dr. Savage again noted that Stone was suffering a severe emotional impact from his back problems.  Dr. Savage's examination results were the same as before.  Dr. Savage continued Stone's medications.  R. 652-53.

On June 10, 2008, Stone saw Dr. Savage.  Dr. Savage's notes regarding Stone's condition and the examination results were substantially the same as the notes from the May 9, 2008 visit, except the notes included the additional complaint about back pain that first appeared in the notes from the March 12, 2008 visit, and the notes also stated that Stone's lumbar spine flexion was reduced from 90 degrees to 60 degrees.

Dr. Savage continued Stone's medications except he switched Stone to Ambien for his sleeping problems.  R. 655-56.

On July 8, 2008, Stone saw Dr. Savage.  Dr. Savage's notes regarding Stone's condition and the examination results were substantially the same as the notes from the May 9, 2008 visit.  Dr. Savage continued Stone's medications.  R. 658-59.

On August 12, 2008, Stone saw Dr. Savage for a pill count.  Stone brought his patches, but not his pills.  He had the correct number of patches.  He was told to bring in pills at a later date.  Stone and Dr. Savage discussed "pain agreement and his legal issues surrounding his back injury and application for dissability [sic]."  R. 666.  Dr. Savage continued Stone's medications.  R. 667.

On August 15, 2008, Dr. Savage completed another Medical Leave Certification form.  Dr. Savage listed Stone's diagnosis as degeneration of lumbar and lumbosacral intervertebral disc.  Dr. Savage checked the boxes to indicate that Stone was permanently and totally disabled and could not perform any gainful employment.  R. 671.

On September 9, 2008, Stone saw Dr. Savage.  Stone reported that he was hurting worse and was "tired, depressed, and pissed off!!!"  R. 675.  He reported that he took an herbal remedy L-Tryptophan, also called

5-HTP, and felt a bit better.  He reported a breakup with his girlfriend.

Dr. Savage's notes regarding Stone's condition and the examination results

were substantially the same as the notes from the June 10, 2008 visit.

Dr. Savage continued Stone's medications.  R. 675-76, 816.

On October 14, 2008, Stone saw Dr. Savage.  Stone reported that he

went to a chiropractor.  The notes do not indicate whether the chiropractor

provided any relief.  Dr. Savage noted that Stone felt well except for minor

complaints, had decreased energy, and was sleeping poorly.  The

remainder of Dr. Savage's notes regarding Stone's condition and the

examination results were substantially the same as the previous visit.

Dr. Savage continued Stone's medications.  R. 724-25.

On November 11, 2008, Stone saw Dr. Savage.  Dr. Savage's notes

regarding Stone's condition and the examination results were substantially

the same as the previous visit, except Dr. Savage noted depression as an

additional, separate complaint and described Stone's mood and affect as

anxious and depressed.  Dr. Savage continued Stone's medications and

added Cymbalta for depression.  R. 726-27.  Stone stopped taking the

Cymbalta at some point thereafter because he was not receiving any

benefit from it and it caused negative side effects.  R. 816.

On December 9, 2008, Stone saw Dr. Savage.  Dr. Savage noted that Stone felt his mood was a little better.  Dr. Savage's notes regarding Stone's condition and the examination results were substantially the same as the previous visit.  Dr. Savage continued Stone's other medications. R. 731-32.  Dr. Savage also ordered a functional capacity test.  R. 761.

On December 9, 2008, Dr. Savage also completed a Social Security Administration Listing of Impairments form.  The form related to the Social Security Administration's regulations that list disorders that are disabling regardless of the individual's age, education, or work experience. 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  The form specifically concerned Listing 1.04 for disorders of the spine.  Dr. Savage checked the box that indicated that Stone had evidence of nerve root compression characterized by loss of reflexes in his right knee.  R. 734.  Dr. Savage, however, did not check any boxes which would indicate whether Stone's condition did or did not meet the Listing for disorders of the spine, or whether his condition was medically equivalent to the Listing.   R. 735.

On December 11, 2008, Stone saw Dr. Wynndel Buenger, M.D., a pain specialist, on referral from Dr. Savage.  Stone reported that the Oxycontin and Fentanyl were not controlling his pain adequately.

Dr. Buenger told Stone that he would consider accepting Stone as a patient if he would be evaluated by a psychologist for the potential for addiction to pain medication.  Dr. Buenger referred Stone  to Dr. Shannon Baugher, Ph.D., for evaluation.  R. 720-22.

Stone saw Dr. Baugher on January 6, 2009.  Dr. Baugher interviewed Stone and administered a battery of psychological tests.  Dr. Baugher found that Stone was oriented and could easily follow verbal commands. Stone's affect was appropriate.  Stone's thought process was normal and Stone demonstrated an appropriate range of social skills.  Stone's memory was intact and his judgment making capacity was normal.  Dr. Baugher found that Stone's depression and anxiety were in the mild range. Dr. Baugher opined that Stone was not suffering any psychological disturbances that would impair his ability to live independently, maintain a job, or develop relationships.  Dr. Baugher noted that Stone had engaged in drug seeking behavior in the past.  Dr. Baugher opined that this behavior resulted from an under treatment of his pain.  When Stone's pain was treated appropriately, this behavior diminished or ceased.  Dr. Baugher opined that Stone was a good candidate for pain management treatment. R. 752-57.

On January 20, 2009, Dr. Savage completed a Disability Medical report for the Illinois State Retirement System.  R. 773.   Dr. Savage stated that Stone was no longer under his care for pain treatment, but was being treated by Dr. Buenger.  R. 773.

On January 21, 2009, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 800-64.  Stone appeared at the hearing with counsel.  A vocational expert, Brenda Young, was also present.  Stone testified that he and Dr. Savage decided that he should stop working on February 15, 2008, due to his back pain.  Stone testified that the pain was getting worse, the pain medications were not working as well, and his condition had reached the point that he could not work.  R. 811-12.  Stone testified that, at the time of the hearing, he was receiving non-service leave medical benefits from the Illinois state retirement system.  He began receiving them on March 16, 2008.  R. 808, 813.  He was receiving half his former salary in medical benefits.  R. 813.

Stone testified that his depression was interfering with his ability to work.  He testified that he was still taking the herbal supplement L-Tryptophan for his depression.  R. 816.  He also testified that he was participating in some counseling and was considering participating in some group counseling.  R. 817.

Stone testified that his sleeping difficulties interfered with his ability to work.  He stated that that the patch pain medication was the main cause of his sleep problems.  He also stated that stress caused some of his sleeping problems.  R. 819-20.  He testified that he slept three hours the night before the hearing.  Stone could not estimate the number of hours that he slept on average at night.  R. 830.  He testified that he took naps during the day because he could not sleep at night.  R. 830.

Stone testified that his back pain also interfered with his ability to work.  He testified that he could hardly get up and do anything because of the pain.  He stated that he had shooting pains down his side; he was weak; and he threw up every morning.  820-21.

Stone testified that he dressed himself and made simple meals for himself.  He avoided household chores "until I feel enough better where I can do a little bit of this and a little bit of that."  R. 822.  He testified that his daughter and son came to his residence and helped on weekends if he had anything major that needed to be done, such as vacuuming.  R. 822.  Stone did his own grocery shopping.  His father mowed his yard for him.  R. 823.  He testified that he spent most of his days lying on the couch.  R. 823.  He did not have hobbies.  He did not visit with friends.  He went to church about once every two months.  He drove once or twice a week,

usually to the store.  The longest trip he had driven in the preceding month
was 16 miles to Carlinville, Illinois.  R. 824-25.

Stone testified that he smoked half a pack of cigarettes a day and did
not drink.  He previously had a drinking problem, but had not taken a drink
in three and a half to four years.  He testified that he went to AA meetings
once a month.  R. 825.  He did not take any illegal drugs.  R. 826.

Stone testified that he could sit for 3 minutes, kneel for a few minutes,
and stand for three or four minutes.  R. 827.  He testified that the only
comfortable position was lying down.  R. 827-28.  He did not read.  He
mostly watched television while lying on the couch.  R. 831-32.

He testified that he had trouble walking and occasionally used a
walker.  R. 828.  According to Stone, the pain worsened if he stood or sat
too long.  R. 830.  Stone testified that he had difficulty lifting and could not
lift a gallon of milk. R. 829.  He testified that he used a TENS unit to
stimulate his spine.  The TENS unit helped relieve some of the pain.
R. 827.

 At the end of the hearing, the ALJ determined that he wanted Stone
to be evaluated by consulting physician.  R. 832-33.  The ALJ wanted the
evaluation completed before the vocational expert testified.  The ALJ
adjourned the hearing to reconvene after the assessment.  R. 834-36.

On February 3, 2009, Stone underwent a functional capacity assessment performed by an occupational therapist, Rebecca Roddick, OTR/L.  Stone complained of back pain and stated that sitting, standing, and riding in a car aggravated his pain.  Stone stated that bed rest, water therapy, and medication provided some pain relief.  Roddick stated that Stone displayed inappropriate and/or inconsistent pain behavior and gave submaximal and inconsistent effort during much of the actual testing. Roddick found that Stone had normal strength and range of motion, normal reflexes, normal grip strength, and normal fine and gross motor skills. R. 763-66.  Roddick found "Deficit present with spinal flexion and extension."  R. 764.

Roddick opined that Stone had the ability to climb 30 ladder rungs, crouch for 60 seconds, and stand for 30 minutes.  She also opined that Stone had average push/pull ability and good ability to balance.  She opined that Stone was unable to ambulate .25 mile, unable to climb 100 stairs, unable to kneel for 5 minutes, unable to perform forward flexion for 5 minutes, and unable to sit for 30 minutes.  She could not determine Stone's material handling ability due to his refusal to lift and carry.  R. 765.  Roddick specifically noted submaximal effort in the material handling parts of the examination.  Roddick further noted that Stone "appeared symptom

focused, as task performed in testing were limited by report of symptom provocation." R. 765.

Roddick opined that in an eight-hour workday, Stone could: push and pull between 22 and 25 pounds; rarely walk, kneel, engage in forward flexion, and engage in sustained sitting; occasionally climb stairs, crouch, crawl, and engage in sustained standing; frequently climb ladders and balance. She also opined that in an eight-hour workday, Stone would have no limitations on his range of motion, his fine or gross motor skills, or his sensation of touch. R. 766.

On February 4, 2009, Stone saw Dr. Buenger. Stone reported that he was doing significantly better. Dr. Buenger had changed Stone's medications from one 100 mg Duragesic Patch every three days to one 75 mg patch every two days. Dr. Buenger noted that an MRI revealed some foraminal stenosis on the right. Dr. Buenger performed a right L5 transforaminal epidural steroid injection. Dr. Buenger ordered a thoracic MRI. R. 776.

On March 5, 2009, Stone saw Dr. Raymond Leung, M.D., for a consultative examination. Stone complained of back pain that sometimes radiated into his right leg. Stone reported that he may use a walker six days out of 30 days on average. Stone reported that he received an

injection four weeks earlier, but it helped for only a week.  Stone stated that he could walk two blocks and lift five pounds.  Stone reported that he suffered from depression.  Dr. Leung noted that Stone did not bring his walker with him.

On examination, Stone's gait was normal; he could walk 50 feet unassisted; he could tandem walk and hop; he could heel walk, toe walk, and squat three-quarters of the way down.  Stone's back was not tender. Stone had no muscle atrophy and no spasms.  Stone's straight leg lifting was limited to 30 degrees bilaterally.  Stone had full range of motion except that his lumbar extension was limited to five degrees.  Stone's leg strength was 4+/5 and he had no difficulty getting on and off the examination table. Stone's sensations were within normal limits and his reflexes were 2+ and equal.  Dr. Leung found no lower extremity peripheral edema.  R. 777-79.

Dr. Leung opined that Stone could frequently lift or carry up to 10 pounds and occasionally lift or carry up to 50 pounds; he could sit for eight hours in a workday, stand for four hours, and walk for two hours; he could occasionally operate foot controls bilaterally; he could frequently balance and occasionally stoop, kneel, crouch, or crawl, but could never climb stairs, ramps, ladders, or scaffolds; he could never work at unprotected heights or around moving mechanical parts; and he could never operate a

motor vehicle at work.  Dr. Leung opined that Stone could perform activities

such as shopping; he could ambulate without a walker, two canes, or two

crutches; he could walk a block at a reasonable pace over rough or uneven

surfaces; he could prepare simple meals; and he could take care of his

personal hygiene.  R. 778-80.

The ALJ reconvened the hearing on June 3, 2009.  Stone appeared

with counsel.  A vocational expert, Dr. Jeffrey Magrowski, Ph.D., also

appeared.  Stone testified that his back pain had worsened.  He also

testified that the change in his medication from one patch every three days

to one patch every two days interfered with his sleep.  R. 848-51.

Magrowski then testified.  Magrowski testified that Stone's computer

technician job at the Illinois Secretary of State's Office was usually a

sedentary job in the national economy, but was a medium job as Stone

described it because Stone was required to lift up to 50 pounds.  R. 853-54.

The ALJ asked Magrowski to assume a person of Stone's age with

his education and work experience, who also had the functional capacity

set forth in Dr. Leung's opinions.  The ALJ asked if such a person could

perform any of Stone's past relevant work.  Magrowski opined that he could

perform the prior work as an accounting technician (referred to by

Magrowski as accounting clerk) as it is usually performed in the national

economy.  R. 856-57.  Magrowski also opined that such a person could

perform other jobs that exist in the national economy such as appointment

clerk.  Magrowski opined that 2,000 such jobs existed in Illinois and about

75,000 such jobs existed in the national economy.  R. 858.  This job was

representative of jobs that such a person could perform.  R. 858.

The ALJ then asked Magrowski to assume the same person had the

limitations set forth in Roddick's functional capacity assessment.  R. 859.

Magrowski opined that such a person could perform the jobs he previously

identified if the person could alternate between sitting and standing during

the workday.  R. 860.

Magrowski also opined that such a person could not perform the jobs

he identified if he needed to be able to change at will from sitting to

standing during the workday.  Magrowski further opined that such a person

could not maintain employment if he had to miss work two or more days

each month.  R. 861.  Magrowski opined that that person could not

maintain a position if he was late once a week, had to leave early, or had to

take extra breaks during the workday.  R. 861.  The ALJ then adjourned the

hearing.

<u>THE DECISION OF THE ALJ</u>

The ALJ issued his decision on July 15, 2009.  R. 461-70.  The  ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of the claimant's age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet the criteria in a Listing or be equal to the criteria in a Listing.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Stone met his burden at Step 1.  He had not engaged in substantial gainful activity since the amended onset date of February 15, 2008.  The ALJ determined that Stone's decision to amend the onset date on which his disability began from December 29, 2003, to February 15, 2008, rendered moot the issue on remand of whether he was disabled while working for the Illinois Secretary of State's Office.  Stone stopped working on the amended onset date of February 15, 2008, and so, did not engage in substantial gainful activity during the time period that he now claimed to be disabled.  Stone met his burden at Step 1.

The ALJ also found that Stone met his burden at Step 2 because he showed that he suffered from severe impairments.  The ALJ identified Stone's impairments as status-post fusion at L4-5 and L5-S1, ongoing lumbar pain, and intermittent insomnia.  R. 469.

At Step 3, the ALJ found that Stone's impairments did not meet any impairment listed in the Listings.  At Step 4, the ALJ determined that Stone had an RFC set forth in Dr. Leung's opinions.  R. 465-66.  The ALJ stated that such an RFC would allow Stone to perform sedentary work, except that he was limited to occasional walking and standing.  The ALJ also relied on Dr. Weiss's opinions and Roddick's functional capacity findings to support this conclusion.

The ALJ discounted Dr. Savage's opinions that Stone was disabled because the opinions were inconsistent with the other medical evidence. The ALJ found that Dr. Savage's opinions were inconsistent with the opinions of Drs. Weiss, Buenger, and Leung, the functional capacity evaluation by Roddick, and Dr. Savage's own treatment notes.  The ALJ found that Dr. Savage's treatment notes showed Stone "to be stable with infrequent acutely severe complaints."  R. 466.

The ALJ also found that Stone's testimony about the severity of his pain was not credible.  The ALJ stated that Stone did not have "most of the signs typically associated with chronic, severe musculoskeletal pain." R. 467.   The ALJ further found that Stone's depression did not affect "his ability to think, understand, communicate, concentrate, get along with other

people, and handle normal work stress."  R. 467.  The ALJ relied on Dr. Baugher's evaluation for this finding.  R. 467.

The ALJ then found at Step 4 that Stone was not disabled because he could perform his prior job as an accounting technician.  R. 466.  The ALJ's relied on his RFC finding and Magrowski's opinion that Stone could perform the accounting technician job as it was performed generally in the national economy.  R. 466, 468-69.  In the alternative, the ALJ found that Stone was not disabled at Step 5 because he could perform a significant number of jobs that exist in the national economy.  The ALJ relied on the RFC finding and Magrowski's opinion that Stone could perform the appointment clerk job and that 2,000 such jobs existed in Illinois and 75,000 such jobs existed in the national economy.  R. 466, 468-69.

## THE DECISION OF THE APPEALS COUNCIL

Stone appealed the Appeals Council.  On March 25, 2011, the Appeals Council adopted the ALJ's decision as the final decision of the Commissioner after remand by the Court.  R. 419.  On February 21, 2012, the Appeals Council granted Stone's request for an extension of time to file an action for judicial review to August 16, 2011, the date on which Stone filed this action.  R. 417.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  In making this review, the Court considers the evidence that was before the ALJ.  Wolfe v. Shalala, 997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).

The ALJ's decision is supported by substantial evidence.  His findings at Steps 1 and 2 are undisputed.  Stone has not engaged in substantial gainful activity since the amended onset date, and Stone suffers from severe impairments from his post-operative back condition, his associated

back pain and his insomnia related to the pain and side effects of the

medication.[1]

The ALJ's finding at Step 3 that Stone's condition, or combination of

conditions, did not meet any Listing is supported by substantial evidence.

Back pain is covered by Listing 1.04, which states, in part,

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

20 C.F.R. § 404app. 1. Listing 1.04(A).  The ALJ's conclusion that Stone

did not meet this Listing is supported by the opinions of Drs. Weiss, Leung,

and Baugher, and by Roddick's functional capacity evaluation.

Stone presented evidence from Dr. Savage on the Social Security

Listing of Impairments Form.  R. 735.  Dr. Savage opined Stone had nerve

root compression accompanied by reflexes loss in the right knee, but

---

[1] The Court agrees with the ALJ that Stone's decision to amend his onset date rendered moot the issue on remand whether he was disabled while he was still working for the Illinois Secretary of State's Office. By amending the onset date, Stone now alleges that he became disabled on February 15, 2008.  The only issue under Step 1, then, is whether he was engaged in substantial gainful activity after that date. 20 C.F.R. §§ 404.1520(b), 416.920(b).  His work before that date has been rendered irrelevant by the change.

Dr. Savage did not indicate whether Stone's condition met the Listing.
Stone's condition, further, involved the lower back.  As quoted above, the
Listing requires positive straight leg testing in both the sitting and supine
positions in such cases.  Stone presented no evidence of test results that
met this requirement.  The ALJ's conclusion that Stone did not meet this
Listing, therefore, is supported by substantial evidence.

The ALJ also determined that Stone did not meet any Listing due to
his depression.  Dr. Baugher's evaluation supported this conclusion.
Dr. Baugher found that Stone's depression and anxiety were in the mild
range.  Dr. Baugher opined that Stone was not suffering any psychological
disturbances that would impair his ability to live independently, maintain a
job, or develop relationships.  R. 755.  These findings provide substantial
evidence to support the ALJ's findings that Stone did not meet a Listing due
to his depression.  See Listing 12.04.

The ALJ's RFC finding at Step 4 is also supported by the opinions of
Drs. Weiss, Leung, and Baugher.  Dr. Weiss found that Stone could
perform all of the essential function of his prior job except lift 50 pounds.
The ALJ adopted Dr. Leung's opinion as the basis for the RFC finding.

Dr. Baugher's findings that Stone's depression was mild and would not impair his ability to maintain a job supported the ALJ's decision not to place any cognitive limitations on Stone's RFC.

The ALJ's decision to discount Dr. Savage's opinions is also supported by substantial evidence.  A treating physician's medical opinion is entitled to controlling weight when it is well supported by medically acceptable clinical and diagnostic techniques and is reasonably consistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2); SSR 96-2p.  The ultimate question of whether a claimant is disabled, however, is left to the Commission.  20 C.F.R. § 404.1527(e)(1).  Thus, the Commission is not required to give controlling weight to a treating physician's conclusory opinions that merely state that the claimant is "disabled" or "unable to work."  See Denton v. Astrue, 596 F.3d 419, 424 (7th Cir. 2010).  Dr. Savage only offered conclusory opinions that Stone was disabled.  His opinions were also inconsistent with the opinions of Drs. Weiss and Leung.  The ALJ's decision to discount Dr. Savage's opinions, therefore, is supported by substantial evidence.

The ALJ's determination to discount the credibility of Stone's testimony about the severity of his pain is also supported by substantial evidence.  This Court will not review the credibility determinations of the

ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  Stone essentially testified that he could only sit or stand for a few minutes before he had to change positions.  This testimony was inconsistent with the findings of Drs. Leung and Weiss, and Roddick's functional capacity assessment.  Stone also testified that he was in constant pain.
Dr. Savage's treatment notes, however, repeatedly stated that Stone was often feeling well with only minor complaints and that he had good energy.  These repeated reports were inconsistent with his testimony.  Given these inconsistencies, the Court will not disturb the ALJ's finding that Stone's testimony about the severity of his condition was not credible.

        The ALJ's finding at Step 4 that Stone could perform his prior work as an accounting technician is supported by substantial evidence.  The ALJ may make the determination at Step 4 based on either (1) the manner in which the job is performed generally in the national economy or (2) the specific manner in which the claimant performed the job at his past relevant work.  Getch v. Astrue, 539 F.3d 473, 482 (7th Cir. 2008).  Magrowski's opinion that a hypothetical person with Stone's age, experience, education, and RFC found that Stone could perform the accounting technician's

position as it existed in the national economy generally.  This opinion is sufficient to support the ALJ's finding at Step 4.

The RFC finding and the opinions of Magrowski also support the ALJ's finding at Step 5 that Stone could perform a significant number of jobs in the national economy.  The evidence that he could perform 2,000 appointment clerk jobs that exist in Illinois and 75,000 such jobs that exist nationally is sufficient to support this conclusion.  See e.g., Liskowitz v. Astrue, 559 F.3d 736, 743 (7th Cir. 2009) ("[I]t appears to be well-established that 1,000 jobs is a significant number.").  The ALJ's decision, thus, is supported by substantial evidence.

Stone argues that the ALJ did not consider the level of narcotics he took or the evidence that he had to use a cane or walker to ambulate.  All of the doctors knew of the medications that Stone was taking, and so, considered those medications when rendering their opinions about his condition.  Dr. Leung, further, considered the fact that Stone used a walker six days a month when rendering his opinion.  Stone also presented no evidence that any doctor prescribed or recommended using a cane or walker.  The ALJ properly relied on the opinions of these doctors, notably Drs. Weiss and Leung, and so took both the medications and the use of a cane or walker into account in making his decision.

Finally, Stone submitted additional evidence to the Appeals Council and to this Court.  Such evidence is irrelevant to determining whether the decision is supported by substantial evidence.  Eads v. Secretary of Health and Human Services, 983 F.2d 815, 817-18 (7th Cir. 1993).  Such evidence may be a basis for remand for a new hearing if the evidence is material and Stone presents good cause to explain why he did not present the evidence to the ALJ before in the prior proceeding.  See 42 U.S.C. § 405(g) sentence six.  Stone fails to present good cause to explain his failure to present any material evidence to the ALJ.

Stone presented significant medical evidence about his condition after the ALJ's decision.  Such evidence is not material unless the evidence relates to Stone's condition before the administrative hearing.  See Getch v. Astrue, 539 F.3d 473, 484 (7th Cir. 2008).  Stone's evidence of his condition after the hearing did not relate to his earlier condition.  The evidence, therefore, is not material.  Stone's supplemental submissions present no basis for a remand.

WHEREFORE this Court recommends that the Defendant Commissioner's Motion for Summary Affirmance (d/e 16) should be ALLOWED and Plaintiff Stone's Motion for Summary Judgment (d/e 14)

should be DENIED and the decision of the Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

Enter:       January 9, 2013

s/ *Byron G. Cudmore*
UNITED STATES MAGISTRATE JUDGE